**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

DENNIS W. WILKINSON,

          CASE NO. 18-13728

     *Plaintiff*,         DISTRICT JUDGE THOMAS L. LUDINGTON

*v.*             MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL
SECURITY,

     *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON**
**CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 17)**

## I.    RECOMMENDATION

Plaintiff Dennis Wilkinson appeals defendant Commissioner's final decision denying his application for disability benefits. He argues that the administrative law judge (ALJ) erred by (1) disregarding evidence that he would miss more than two days of work per month and (2) failing to find that his impairments met or equaled in severity a listed impairment. (ECF No. 13, PageID.737-751.) In light of the record, I suggest that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENRYING** Plaintiff's Motion for Summary Judgment, (ECF No. 13), **GRANTING** the Commissioner's Motion, (ECF No. 17), and **AFFIRMING** the Commissioner's final decision.

1

II.    **REPORT**

A.    **Introduction and Procedural History**[1]

Plaintiff applied for Title II Disability Insurance Benefits (DIB) on October 31, 2011, alleging that his disability had begun on November 23, 2010. (ECF No. 9, PageID.457.) The Commissioner denied the claim. (ECF No. 9, PageID.149.) Plaintiff then requested a hearing before an ALJ, which occurred on March 26, 2013. (ECF No. 9, PageID.74-106.) The ALJ issued a decision on May 17, 2013, finding Plaintiff not disabled during the relevant period. (ECF No. 9, PageID.207-211.)

On November 28, 2014, the Appeals Council vacated the ALJ's decision and remanded the case to resolve various issues: further evaluation of medication side effects, with assistance from a medical expert; further evaluation of treating physician John Lemke; clarification of the residual functional capacity (RFC) regarding Plaintiff's ability to climb stairs; and specific findings pertaining to Plaintiff's past relevant work. (ECF No. 9, PageID.216-218.) On remand, another hearing was held, (ECF No. 9, PageID.108-188), after which, on August 3, 2015, the ALJ issued a decision again denying Plaintiff's claim, (ECF No. 9, PageID.48-65). This time, the Appeals Council denied review on October 3, 2018. (ECF No. 9, PageID.33-36.)

Plaintiff filed the present action on November 30, 2018, seeking review of Defendant's decision. (ECF No. 1.) The parties have filed cross-motions for summary

---

[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, (ECF No. 3), this case was referred to me to review the Commissioner's final decision denying Plaintiff's claim for Disability Insurance Benefits.

judgment, briefing is complete, and the case is now ready for resolution. (ECF Nos. 13, 17.)

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.       Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*,

475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than [twelve]
> months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to

be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If
> you are doing substantial gainful activity, we will find that you
> are not disabled.
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically
> determinable physical or mental impairment that meets the
> duration requirement . . . or a combination of impairments that
> is severe and meets the duration requirement, we will find that
> you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of
> your impairment(s). If you have an impairment(s) that meets or
> equals one of our listings in appendix 1 of this subpart and
> meets the duration requirement, we will find that you are
> disabled.
>
> (iv) At the fourth step, we consider our assessment of your
> residual functional capacity and your past relevant work. If you
> can still do your past relevant work, we will find that you are
> not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your
> residual functional capacity and your age, education, and work
> experience to see if you can make an adjustment to other work.
> If you can make an adjustment to other work, we will find that
> you are not disabled. If you cannot make an adjustment to other

4

work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)). The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 9, PageID.65.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the day the disability allegedly began,

November 23, 2010, through the date last insured, December 31, 2012. (ECF No. 9, PageID.50.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "cervical and lumbar degenerative changes; obesity; herniated lumbar discs; and status post 2001 lumbar laminectomy."[2] (*Id.*) None of these impairments, alone or in combination with others, met or equaled the severity of a medical listing at step three. (ECF No. 9, PageID.52.)

Before completing the final steps, the ALJ found that Plaintiff had the RFC to perform

> light work as defined in 20 CFR 404.1567(b) limited to no climbing ladders, ropes, or scaffolds and only occasionally stooping, climbing of ramps or stairs, kneeling, crouching, crawling, or balancing. The claimant is limited to occasionally pushing and pulling with his left upper extremity. Additionally, the claimant can frequently reach overhead and handle with his left upper extremity.

(ECF No. 9, PageID.54.)[3] At step four, the ALJ found Plaintiff capable of performing his past relevant work as a program manager, manufacturing representative, and sales account

---

[2] In the 2013 decision, the severe impairments were slightly different: "lumbar degenerative disc disease (DDD) - status post laminectomy; lumbar herniated discs; cervical spondylosis; and obesity." (ECF No. 9, PageID.180.)

[3] The 2013 decision offered a different RFC:

> [T]he claimant had the [RFC] to perform a range of light work defined in 20 CFR 404.1567(b). The claimant is further limited to a maximum time sitting or standing of two hours at one time; he would need the opportunity to change from sitting to standing and standing to sitting at least every two hours; no climbing of ladders, ropes, or stairs; less than frequent climbing of ramps or stairs, balancing, stooping, kneeling, crouching, and crawling; overhead reaching would be limited to frequent; handling with the left upper extremity is limited to frequent; and the claimant must avoid concentrated exposure to hazards such as machinery and heights.

(ECF No. 9, PageID.208.)

manager. (ECF No. 9, PageID.64.)[4] Because of this finding, the ALJ had no need to consider step five.

###### E. Administrative Record

###### 1. Overview of the Medical Evidence

In November 2001, Plaintiff "had a decompression laminectomy and excision of the L4-5 disc." (ECF No. 9, PageID.578; *see also* ECF No. 9, PageID.645-646 (surgical report).) The following month, Dr. David A. Herz wrote a note stating that Plaintiff could return to work part-time at the end of January 2002, with various restrictions: minimized lifting over 15 to 20 pounds; minimized bending, twisting, pushing, or pulling; avoidance of strenuous exertion; and an option for alternating between sitting and standing. (ECF No. 9, PageID.579, 647.)

The next report comes from 2007, detailing a long list of medications Plaintiff took. (ECF No. 9, PageID.708.) That record was from Dr. John Lemke's office. In November 2010, that provider ordered an MRI to investigate lumbar radiculopathy. (ECF No. 9, PageID.580.) The results showed large disc protrusions at the L4-5 level, which also was beset by a large disc fragment; limited disc bulges at the L3-4 level; and extradural abnormalities at the L4-5 and L5-S1 levels. (ECF No. 9, PageID.580-581; *see also* ECF No. 9, PageID.611-612.) At an appointment that month, Plaintiff continued to complain of radiating back pain, although it appears it had decreased; he was noted to be alert and not

---

[4] In the 2013 decision, the ALJ found Plaintiff capable of performing past relevant work as a program manager, account executive, and industrial sales representative. (ECF No. 9, PageID.211.)

lethargic, but had a positive straight-leg-raise test.[5] (ECF No. 9, PageID.575.)

The same month, Plaintiff began physical therapy with Dan Distin. (ECF No. 9, PageID.593.) Plaintiff reported that his back and leg pain began three weeks prior when he arose from an office chair; before that, his "functional level . . . was within normal limits." (ECF No. 9, PageID.613.) He had a positive straight-leg-raise test. (*Id.*) He had no problem getting in and out of bed, but was "limited a little" getting in and out of a chair or walking a block; lifting groceries from the floor or completing usual work housework were "[q]uite a bit" difficult, shoveling dirt was moderately difficult, and standing for an hour would be extremely difficult. (ECF No. 9, PageID.615.) He walked with antalgic gait, had decreased range of motion during the right straight leg test, and his core strength was 3+ to 4-.[6] (ECF No. 9, PageID.613, 615.) Overall, Distin concluded that Plaintiff had decreased strength and range of motion in his trunk and legs, "[f]aulty joint biomechanics," and "[i]nability to perform pain-free" daily activities. (ECF No. 9, PageID.614.)

The physical-therapy session notes are largely unilluminating, although one from January 2011 indicated continued progress. (ECF No. 9, PageID.583.) By April 2011, Plaintiff had met all his physical therapy goals. (ECF No. 9, PageID.593.) At that time, Plaintiff reported the following: He was not limited at all in participating in recreation,

---

[5] "A straight leg raise is positive if pain in the sciatic distribution is reproduced between 30 [degrees] and 70 [degrees] . . . ." Cathy Speed, *ABC of Rheumatology: Low Back Pain*, 328 Brit. Med. J. 1119, 1120 (2004).

[6] Muscle strength is graded on a scale from 0 to 5. Usker Naqvi & Andrew I. Sherman, *Muscle Strength Grading*, Nat'l Inst. Health, https://www.ncbi.nlm.nih.gov/books/NBK436008/ (last accessed Oct. 31, 2019). A grade of 3 means the muscle activates against gravity, with a full range of motion. *Id.* A grade of 4 indicates that the muscles activate against some resistance, and have full range of motion. *Id.* A grade of 5 shows activation "against examiner's full resistance," again with full range of motion. *Id.*

walking several blocks, walking over a mile, climbing several flights of stairs, engaging in moderate activities (like bowling, golfing, moving a table, or vacuuming), or getting in and out of bed. (ECF No. 9, PageID.608.) He had "a little bit of difficulty" with his usual hobbies, work, and housework. (*Id.*) He was "limited a little" in lifting and carrying groceries and in "[v]igorous activities" ("like running, lifting heavy objects, participating in strenuous sports"). (*Id.*) Finally, he had moderate difficulty with heavy activities around his house. (*Id.*)[7]

In June 2011, during treatment for injuries after a bike accident, Plaintiff denied back pain, claimed a normal activity level, and was noted to be alert without any mention of abnormalities in his back. (ECF No. 9, PageID.574.) During his November 2011 visit with Dr. Lemke, Plaintiff denied back pain—although his right leg hurt—and claimed a normal activity level. (ECF No. 9, PageID.568.) It appears that Plaintiff's reflexes were somewhat reduced and his straight-leg-raise test was negative. (*Id.*)

At his first appointment with Dr. Lemke in August 2011 he again complained of low back pain, although any related objective findings are indecipherable; he was observed as alert and instructed to continue all his medications. (ECF No. 9, PageID.571.) But at the next session later that month he denied back pain, claimed to have a normal activity level, and was noted to be alert; no abnormalities were flagged. (ECF No. 9, PageID.570.)

In November that year, physical therapy recommenced, and Distin wrote Dr. Lemke that Plaintiff's prognosis was good. (ECF No. 9, PageID.586.) Six weeks earlier, Plaintiff

---

[7] The form on which the foregoing reports appeared was unsigned.

had injured his shoulder when he fell off his bike and he had continued lower back pain radiating to his legs. (*Id.*) Objectively, Distin observed that Plaintiff walked without antalgic gait or assistive device; his left shoulder's flexion range of motion was 160 degrees, and his straight-raise-test showed restrictions—which the parties characterize as a positive test, (ECF No. 13, PageID.747); (ECF No. 17, PageID.781-782)—but all other measures of his motion were normal; his cervical range of motion was normal; his strength was at 4 to 5 throughout; and his neurological screening was "unremarkable." (ECF No. 9, PageID.586.) Distin assessed decreased motion and strength and "[i]nability to perform pain-free" activities of daily living, which Plaintiff had indicated during intake questioning. (ECF No. 9, PageID.587-588.)

Dr. Sergey Tsekhanov evaluated Plaintiff in February 2012. (ECF No. 9, PageID.623-626.) The resulting report gives an overview of Plaintiff's medical history, beginning with an "original injury" in a factory in 1990, followed by later injuries. (ECF No. 9, PageID.623.) The 2001 surgery gave a decade of relief, but in 2011 the back pain worsened. (*Id.*) On examination, Plaintiff had an ataxic gait; there was decreased range of motion in the cervical and lumbar spine, left shoulder, and right elbow; his straight-leg-raise test was positive on the left; he had cervical muscle spasms and tenderness in the right elbow and left shoulder; his grip strength was decreased in the left hand; both hands had full dexterity; and he had "moderate difficulty getting on and off the examination table, heel and toe walking, squatting, and hopping." (ECF No. 9, PageID.624.) His strength was at 5/5 in his arms and legs and he had some numbness in his left hand and foot; his reflexes were present and even; and he was alert and oriented. (ECF No. 9, PageID.625.) Dr.

Tsekhanov concluded that "based on the limited physical exam, [Plaintiff] is not a candidate for exertional or physical duties. . . . He is unable to bear prolonged sitting, standing, or walking. He may be a candidate for part-time employment in an office setting. He is not a candidate for hazardous environments or for pushing, pulling, or exertional duties." (ECF No. 9, PageID.626.)

In June 2012, Dr. Harold Ramsey offered his consulting opinion on Plaintiff's functional capabilities. (ECF No. 9, PageID.632-642.) He concluded that Plaintiff's back and shoulder conditions were severe impairments. (ECF No. 9, PageID.634.)[8] He concluded that Plaintiff's exertional capacity was at the light-work level, that Plaintiff needed a "brief alternate sit/stand break," and that Plaintiff could stand and walk for six out of eight hours and sit for the same. (ECF No. 9, PageID.632.) In addition, Plaintiff had no manipulative limitations and could occasionally (up to one-third of a workday) lift 20 pounds, frequently (up to two-thirds) lift 10 pounds, push and pull without restriction, and occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds. (ECF No. 9, PageID.636-638.) Dr. Ramsey also indicated that Plaintiff's symptoms were "disproportionate to the expected severity or . . . duration" based on his impairments. (ECF No. 9, PageID.640.) But in explanation, he

---

[8] He wrote, "Based on the available MER the impairments of DJD of cervical/lumbar spine and (L) shoulder are severe, but do meet/equal the listings." (ECF No. 9, PageID.634.) Defendant contends that this was a clear clerical error, "as evidenced by the fact that he went on to evaluate Plaintiff's RFC," something he needn't have done if he truly believed Plaintiff met a listing. (ECF No. 17, PageID.778.) Dr. Ramsey's statement certainly reads like a mistake. It's not clear, however, that medical consultants feel bound to refrain from obiter dictum in their reports—he very well could have concluded that Plaintiff met the listings but went on to offer an alternative analysis. In any event, Dr. Ramsey did not say which listings were met and Plaintiff's argument does not rely on this medical opinion. The true meaning of the report can therefore remain a mystery.

simply said, "(See 416)." (*Id.*)

Dr. Lemke ordered another MRI in 2012 that showed cervical-sine spondylosis—specifically, a "small" disc bulge and mild effacement of a lateral recess—but "no . . . significant central canal narrowing." (ECF No. 9, PageID.672.) Another MRI ordered by Dr. Lemke confirmed "[m]ultilevel spondylosis of the cervical spine," but "no findings of significant central canal narrowing; although, multilevel neural foraminal narrowing and lateral recess narrowing are noted." (ECF No. 9, PageID.650.)

Dr. Lemke completed an RFC form in December 2012, specifying Plaintiff's capabilities. (ECF No. 9, PageID.683-686; *see also* ECF No. 9, PageID.653-656 (same).) In it, he diagnosed multi-level spondylosis of the cervical spine, with a guarded prognosis. (ECF No. 9, PageID.683.) Plaintiff experienced pain and tingling in his left arm and pain in his back and left leg. (*Id.*) Symptoms occurred every morning and were exacerbated weekly by prolonged sitting, standing, and lying down. (*Id.*) For objective findings to support his opinion, Dr. Lemke wrote "see MRI reports." (*Id.*) Treatments had "implications" for Plaintiff's ability to work: a few medications made him drowsy and he also needed to stretch. (*Id.*) But rarely would his symptoms be "severe enough to interfere with attention and concentration needed to perform even simple-work tasks." (ECF No. 9, PageID.684.) Based on conversations with Plaintiff, Dr. Lemke concluded he was capable of low stress jobs. (*Id.*) Plaintiff had the following other capabilities: he could walk 12 blocks without rest; sit for 30 minutes; stand for 1 hour; and, during a 8-hour workday, sit for less than 2 hours and stand and walk for 2 hours. (*Id.*; *see also* (ECF No. 9, PageID.648 (handwritten note from Dr. Lemke stating that Plaintiff could not "sit or stand for more

than two hours at a time").) During a workday, Plaintiff would need 10-minute walks every 45 minutes, the ability to alternate between sitting and standing, 4 to 5 unscheduled breaks of 15 minutes. (ECF No. 9, PageID.684-685.) At work, he could rarely lift less than 10 pounds, and never anything heavier. (ECF No. 9, PageID.685.) Plaintiff also had significant restrictions in turning his head and using his left hand and arm. (*Id.*) Finally, Plaintiff's conditions would lead him to miss about three days of work each month. (ECF No. 9, PageID.686.)

Also in December 2012, Plaintiff underwent a neurological evaluation by Dr. Jurgen Luders to investigate his worsening back pain. (ECF No. 9, PageID.651, 687.) There was not, however, "any clear-cut radiculopathy." (*Id.*) Plaintiff complained of joint pain, swelling, stiffness, and arthritis, but most other relevant measures were normal. (*Id.*) He worked out five times per week. (*Id.*) In the physical examination, Plaintiff's "Motor" was "5/5," his sensory was "grossly intact," and his reflexes were normal except for a possible abnormal response in his left bicep.[9] (ECF No. 9, PageID.652, 688.) He was alert, awake, and oriented. (*Id.*) The diagnosis was cervical spondylosis in the C5-7 ranges, and to a lesser extent at C4-5. (*Id.*) Physical therapy was prescribed, with a nuclear study and steroid injections as backups if therapy failed; "surgery would only be an absolute last resort." (*Id.*) In March 2013, the notes indicate that his strength had improved to at least "4" out of "5," he had normal mobility, and it appears his range of motion was somewhat restricted,

---

[9] The report indicates Plaintiff scored "2" in all groups except for his left bicep, which scored "1." A "2" indicates a normal response, while a "1" is "a slight but definitely present response," which "may or may not be normal." H. Kenneth Walker, *Deep Tendon Reflexes*, in Walker, W.D. Hall, et al., eds, *Clinical Methods: The History, Physical, and Laboratory*, ch. 72 (1990).

although the notes provide only the raw numbers rather than an assessment. (ECF No. 9, PageID.698.)

At a physical examination with Dr. Lemke in June 2013, Plaintiff was alert, his neck supple, his gait and coordination were normal, and no musculoskeletal abnormalities were flagged. (ECF No. 9, PageID.691.)

In July 2013, a physical therapist filled out a functional-capacity evaluation form. (ECF No. 9, PageID.702-703.) It noted vague abnormalities with his gait, but that he was able to ambulate and had fair balance; some weakened strength; hamstring tightness; and some pain with movement. (ECF No. 9, PageID.702-703.) The therapist noted that Plaintiff could carry up to 5 pounds frequently and 10 to 15 pounds rarely. (ECF No. 9, PageID.702.) Apparently as a result of testing, the therapist wrote that Plaintiff could lift 12 pounds to the floor and horizontally, and 8 pounds to eye level; but these movements led to easy fatigue and triggered back pain. (*Id.*) Plaintiff could push or pull 20 pounds and occasionally carry 12 pounds at waist level. (*Id.*) His grip strength was normal; his flexibility was limited in the "pelvic/hip/lumbar region"; he could crawl 8 feet and kneel; and he was able to maintain static work but needed frequent positions changes. (ECF No. 9, PageID.703.) Overall, he had "minimal capacity for sustained lifting/carrying," and he could handle 5 pounds occasionally and 10 to 15 pounds rarely; he could stand and walk with increasing pain; he could sit "for short times 2hrs." (*Id.*) In short, he had "significant weakness challenges and postural changes with work related movements/tasks." (*Id.*)

Dr. Lemke's notes from August 2013 report that Plaintiff complained of, among other things, insomnia (apparently due to shoulder pain); back, neck, and shoulder pain but

14

no restriction of movement; and headaches. (ECF No. 9, PageID.718.) Plaintiff was "encouraged to be as active as possible." (ECF No. 9, PageID.711.) The following month, Plaintiff's musculoskeletal pain remained, but he had no other complaints; he did not, for example, complain of restrictions of his movements. (ECF No. 9, PageID.715.) The examination notes from that session are mostly blank. (ECF No. 9, PageID.716.) The pain persisted later in the fall, accompanied by foot pain (although a radiological examination revealed no abnormalities in his foot, (ECF No. 9, PageID.700)); he was not, however, noted to be lethargic, instead presenting as alert and anxious. (ECF No. 9, PageID.712-714.)

In a report from sometime around August 2013, Dr. Lemke drafted a summary of his findings, apparently as a response to the ALJ's decision a few months before. (ECF No. 9, PageID.681.) Over years of treatment, Dr. Lemke had reached the conclusion—shared by others—that Plaintiff's "ailments are chronic in nature and when these attacks occur he is bed ridden for a number of days before he is able to implement his exercise routine that the therapist and I have prescribed." (*Id.*) The exercise routine required at least four sessions a week and was prescribed "to alleviate his pain without having to take higher doses of pain relievers and function in a limited capacity both mentally/physically." (*Id.*) Plaintiff's 2001 back surgery seemed successful at first, "but through the years [he] slowly reinjured himself with even more herniations/bone fragments in his back." (*Id.*) Dr. Lemke strongly disagreed with the ALJ about Plaintiff "being able to lift more than 10lbs on a continuous bas[i]s, [and] being able to sit and stand for more than 30 minutes without pain." (*Id.*) He could not lift more than 10 pounds and should try to avoid climbing ladders,

15

twisting, and squatting; he needed to alternate standing and sitting. (*Id.*)

In May 2014, his back "blew . . . out," he reported. (ECF No. 9, PageID.710.) In January 2015, Dr. R. Scott Lazzara examined Plaintiff and completed a medical-source-statement form. (ECF No. 9, PageID.658-668.) Plaintiff complained of degenerative arthritis in his lumbar spine. (ECF No. 9, PageID.664.) His back would "intermittently go out on him where he will be laid up for 3 to 4 days." (*Id.*) Occasionally, he used an assistive device for walking. (*Id.*) Associated neck pain radiated into his shoulders. (*Id.*) Since 2007, Plaintiff had not worked; his last job ended "because of lack of work." (*Id.*) He could drive, do activities of daily living, occasionally grocery shop, and complete light housework. (*Id.*) Plaintiff estimated that he could "sit 20 minutes, stand less than an hour, and walk ¼ mile before his right foot becomes weak. He can lift 10 pounds." (*Id.*)

Dr. Lazzara's physical examination produced the following results. Plaintiff's mental status was normal; he had normal concentration, insight, and judgment; his neck was supple; his grip strength was intact; his dexterity was unimpaired; he had no trouble getting on and off of the examination table, heel and toe walking, or standing on his left foot; he had mild difficulty squatting and standing on his right foot; his straight-leg-raise test was negative; his muscle tone was normal but his motor strength was diminished to 4/5 on his right leg; and he walked with a mild limp on his right side. (ECF No. 9, PageID.665, 667.) Dr. Lazzara concluded that despite the findings of degenerative arthritis in his spine, Plaintiff's arms "appear relatively stable." (ECF No. 9, PageID.668.) In addition, "[h]e had subtle weakness in the right foot due to chronic nerve root irritation" and "mild difficulty with orthopedic maneuvers." (*Id.*) He did not yet need an assistive

16

device, nor did he need surgery due to probable scarring in the L5-S1 spinal area, although a future operation might be necessary. (*Id.*) There was risk of further deterioration, but he was not "actively declining at present." (*Id.*)

### 2. Function Reports

#### a. 2011 Function Report

Plaintiff filled out his first function report in December 2011. (ECF No. 9, PageID.494-501.) In it, he reported that he could stand or sit for about two hours before pain occurred, and once that happened he needed muscle relaxants and rest. (ECF No. 9, PageID.494.) Asked how his conditions affected his ability to work, he responded, "Because of the nature of my work where sitting & standing are essentials in sales/management its [*sic*] pretty difficult to function in a normal capacity without the use of medications." (*Id.*) During a normal week, he followed the doctors' instructions to exercise four times for up to two hours. (ECF No. 9, PageID.495.) On a typical day, he got ready, made his bed, ate, answered emails, ran errands, walked the dog, rested in the afternoon, and watched the news. (*Id.*)

Before his conditions, he could lift objects without pain, sit for long periods, and run; now he could not. (*Id.*) Sleep was affected by his numbness and pain. (*Id.*)

As far as personal care, he had some problems with putting on socks, tying shoes, reaching for clothes, bathing from the waist down, grooming his feet, and using the toilet. (ECF No. 9, PageID.495.) He did not need any reminders and he could prepare meals twice a day. (ECF No. 9, PageID.496.) Around the house, he vacuumed and dusted; outside, he used a riding mower to cut the grass, with some help from his son. (*Id.*)

He left the house every day—to exercise, weather permitting—and could get around by walking, driving, riding in a car, or riding a bicycle. (ECF No. 9, PageID.497.) He could shop, although he avoided having to stand or walk for long periods. (*Id.*) He spent time with others every day. (ECF No. 9, PageID.498.)

His conditions affected various abilities: lifting (a light load of laundry, at most), bending, standing, reaching, sitting, climbing stairs, and completing tasks. (ECF No. 9, PageID.499.) His attention span was affected by his ADHD. (*Id.*) He did not mark issues with walking, and said that he could go for a mile before needing a 5- to 10-minute rest. (*Id.*) He struggled with spoken instructions, but followed written instructions "okay." (*Id.*) He used crutches and a cane, but neither was prescribed by a doctor. (ECF No. 9, PageID.500.) His medications made him tired and crabby. (ECF No. 9, PageID.501.)

### b.    2015 Function Report

Plaintiff's second function report was filled out in 2015. (ECF No. 9, PageID.547-554.) Much of the information is the same as before, and I will not repeat it. However, he added various assertions. He now reported that he could walk only for a quarter-mile due to pain in his right foot. (ECF No. 9, PageID.547.) Neck pain sometimes caused headaches, and bursitis in his left hip disrupted his sleep. (*Id.*) Occasionally he watched his widowed mother. (ECF No. 9, PageID.548.)

In addition to the impaired abilities he listed in 2011—such as lifting, bending, and reaching—he now added squatting, walking, kneeling, using hands, and concentrating. (ECF No. 9, PageID.552.) Contrary to his initial assertion that his walking ability had decreased, he wrote that he could still walk a mile, needing only 5 to 10 minutes rest

afterward. (*Id.*) He was increasingly unable to handle stress. (ECF No. 9, PageID.553.) His medications continued to cause tiredness, but now also made him feel fatigued, drowsy, and dizzy. (ECF No. 9, PageID.554.)

### 3.   ALJ Hearings

#### a.   2013 Hearing

Plaintiff's first hearing was on March 26, 2013. (ECF No. 9, PageID.72-106.) Plaintiff testified that he usually took an annual fishing trip. (ECF No. 9, PageID.77.) He had not worked since his onset date. (ECF No. 9, PageID.79.) At one past job, he worked as a program manager, which required about 30 percent sitting and lifting up to 20 pounds. (ECF No. 9, PageID.79-81.) Later, he was an account manager, requiring lifting only about 10 pounds. (ECF No. 9, PageID.81-82.) His sales job consisted of 90 percent driving and no significant lifting. (ECF No. 9, PageID.82-83.)

He had surgery in 2001 and reinjured his back in 2011 falling from his bike. (ECF No. 9, PageID.83-84.) In August of that year, while sitting at his desk, his back locked up and he could not stand. (ECF No. 9, PageID.85.) The pain stayed at 8 to 10 (out of 10) for weeks, and he had never fully recovered. (*Id.*) Since then, he had maintained the exercise regimen the doctors had prescribed, which included about two hours of either biking and yoga. (ECF No. 9, PageID.86-87.)

Recently, his shoulder and neck had begun hurting, causing severe headaches. (ECF No. 9, PageID.88.) An MRI showed four pinched nerves in his upper neck, he reported. (ECF No. 9, PageID.89.) He was attending physical therapy for treatment. (ECF No. 9, PageID.88.)

He took various medications, including an anti-inflammatory, an anti-anxiety, and multiple pain medications. (ECF No. 9, PageID.90-91.) These made him drowsy and sleepy. (ECF No. 9, PageID.91.)

The most Plaintiff could lift was 10 pounds. (ECF No. 9, PageID.92.) He used to be able to sit for an hour but "[n]ot anymore, it's like 30 minutes." (*Id.*) After that, his lower back cramped and needed stretching. (*Id.*) When his pain level rose, climbing the stairs was a slog. (ECF No. 9, PageID.93.)

His daily routine had stayed largely the same as discussed in his 2013 Function Report: he exercised for around two hours, handled personal care, checked emails, watched television, walked the dog, did chores or ran errands, napped for about an hour, then cooked and ate. (*Id.*)

He had good days and bad days—severe pain usually struck every 9 to 14 days. (ECF No. 9, PageID.95.) But even during good days, he had a medium level of pain. (*Id.*) As the pain increased, it spread to his right leg down to his foot, at which point he would "hobble at best," not walk. (ECF No. 9, PageID.96.) Breathing would become difficult and his chest tightened; he had begun to fall, too. (*Id.*) Driving cars long distances led to swollen ankles. (ECF No. 9, PageID.96-97.) And the pain also dampened his mood and diminished his concentration. (ECF No. 9, PageID.97.) His hands suffered from the effects of his eczema, with open sores and calluses. (*Id.*) They also felt arthritic, sometimes locking up and weakening his grip.(*Id.*) Finally, he recently began experiencing sleeping problems due

to his shoulder and arm injury. (ECF No. 9, PageID.98.)[10]

### b.    2015 Hearing

### i.    Plaintiff's Testimony

Plaintiff's second hearing took place on April 27, 2015. (ECF No. 9, PageID.107-188.) Much of the testimony mirrored that from the earlier hearing. *See, e.g.*, (ECF No. 9, PageID.114 (noting that he had last fished earlier in the year from the shoreline of a river).) The first substantive line of questioning regarded Plaintiff's medications. Plaintiff now took Flexeril twice a day, although he had previously taken it only once a day. (ECF No. 9, PageID.117-118.) Before that he took Mobic, then Aleve. (*Id.*) During the relevant period—around 2012—he took Mobic every day. (ECF No. 9, PageID.118, 120-121.) He had also taken Tramadol (one or two every couple weeks) for headaches caused by his pinched nerves, although now he took Excedrin. (ECF No. 9, PageID.118, 120.) He also took naproxen for the pain. (ECF No. 9, PageID.118-119.) He no longer took Norco, but at the time he took it once every month or two. (ECF No. 9, PageID.119-120.) For anxiety, he took Xanax around every two weeks during the relevant period. (*Id.*) All of these medications made "tired and drowsy." (ECF No. 9, PageID.121.)

Regarding medication side effects, he noticed that squatting made him dizzy. (ECF No. 9, PageID.132.) Also, each of the medications caused tiredness. (*Id.*) He could not think of any other side effects. (*Id.*) The ALJ then noted that he saw no reports of "fatigue, dizziness, inability to squat, drowsiness, [or] generally feeling tired at all in Dr. Lemke's

---

[10] A vocational expert (VE) then testified, but because the relevant VE testimony for the ALJ decision under review came during the 2015 hearing, I will not recount the 2013 VE testimony.

records." (ECF No. 9, PageID.133.) Had he reported these facts, the ALJ asked. (ECF No. 9, PageID.133.) Yes, Plaintiff responded; he was told that these effects were from the medications. (*Id.*) Dr. Lemke recommended that Plaintiff rest by lying down or using a hot/cold compress. (*Id.*)

His pain would switch between his left and right legs. (ECF No. 9, PageID.123.) The needle-like pain in his feet would come and go. (*Id.*) Nothing provoked the pain or made it worse, although he felt it more in the mornings. (ECF No. 9, PageID.124.) Later in the hearing, he added that standing for half an hour would completely tire his "lower unit," forcing him to lie down; sitting aggravated his herniated disc. (ECF No. 9, PageID.135.) The neck pain was shooting and would inch up into his head, occurring about four days a week. (ECF No. 9, PageID.124-125.) On his right side, the lower back pain would travel downward, whereas his left leg would just tightened and cramp. (ECF No. 9, PageID.126.) The pain in his left elbow that he experienced around 2010 to 2012 was no longer present, but his left hand and shoulder sometimes tingled. (ECF No. 9, PageID.134.) The tingling from 2010 to 2012 occurred "[m]aybe twice a month." (ECF No. 9, PageID.135.)

Asked about his exercise program, he wanted to amend his previous testimony, which in retrospect was incorrect: it took only about an hour and a half, not the two he testified to. (ECF No. 9, PageID.126-127.) And now he said the workouts consisted mostly of stretching and walking. (ECF No. 9, PageID.127-128.) Regarding his biking, it was not two hours of solid riding—he would ride for half an hour, then rest for 15 to 20 minutes, then ride another half-hour. (ECF No. 9, PageID.128, 130.) He had two bikes, one with

straight handlebars and one with ram's horn handlebars. (ECF No. 9, PageID.129.) His stretching and yoga routine took about 45 minutes, usually with more stretching later in the evening for another 45 minutes. (ECF No. 9, PageID.131.) The stretching consisted of pushups, stretching his legs, and leg lifts to strengthen his core. (*Id.*) Most of it took place on the floor. (*Id.*) Since 2012, his ability to exercise had diminished. (ECF No. 9, PageID.132.) The exercising, Plaintiff explained, "helps me with my limited capacity to function in life." (ECF No. 9, PageID.136.)

The pain impeded his concentration. (*Id.*) Also, he needed to change positions almost every fifteen minutes. (ECF No. 9, PageID.1376-137.) He estimated that he would spend eight hours a day lying down. (ECF No. 9, PageID.137.) At stores and the like, he could stand or walk for only 30 minutes before needing a break. (ECF No. 9, PageID.138.)

### ii.     Medical Expert Testimony

Next, the medical expert, Dr. Leonard Rubin, testified. (ECF No. 9, PageID.144.) Asked if the evidence was sufficient to allow him to form a medical opinion, Dr. Rubin testified that "there is evidence, . . . but some of it is contradictory." (ECF No. 9, PageID.141.) One such contradiction was between Dr. Lazzara's report, (ECF No. 9, PageID.658-668), which displayed some "ambivalence" about Plaintiff's condition, and Dr. Lemke's report, (ECF No. 9, PageID.653-656), which "described a much more debilitating picture." (ECF No. 9, PageID.142.)

Dr. Rubin then described the "three significant disease entities" he saw in the records. (ECF No. 9, PageID.143.) The first was cervical and lumbar arthropathy, the second essential hypertension, and third obesity. (*Id.*) "And according to what I can see in

Dr. Lemke's notes and other notes, the patient meets the criteria of 1.04A, according to the Social Security Disability Listings, and possibly 1.04C . . . ." (*Id.*) Regarding listing 1.04(A), Dr. Rubin observed "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, which I think he has both in the cervical area and in the lumbar area," mostly in the latter. (ECF No. 9, PageID.143-144.) This was established in Dr. Lemke's report, (ECF No. 9, PageID.653-656). (ECF No. 9, PageID.143.) Dr. Rubin acknowledged that the report did not "specifically address which nerve root" was affected, but he inferred it was the L4-L5, "which is where he's had difficulty in the past and where he had a laminectomy done in . . . 2001 . . . . which apparently was not successful." (ECF No. 9, PageID.144.) Noting an MRI, (ECF No. 9, PageID.580-581), Dr. Rubin stated, "I don't believe that there's a specific statement about nerve root weakness beyond what the MRI describes, based on the examination." (ECF No. 9, PageID.144.) The notes discussed lumbar radiculopathy, but not which nerve roots were involved. (*Id.*)

Did Dr. Lemke "ever perform[] a lumbar back examination that would be consistent with the diagnosis of lumbar radiculopathy, and, if so, if anything in his examinations could point to the level of radiculopathy that is the lumbar level"? (ECF No. 9, PageID.145.) Dr. Rubin acknowledged that that he could not find anything in the notes that "specifically so state[s]," but the notes "certainly suggest that [Plaintiff's] got L4-5 or L5-S1 radiculopathy." (*Id.*) The ALJ pressed on: was "there anything in his actual physical examination in terms of going through the normal examination that's part of the process of determining if someone has, in fact, a clinical diagnosis of radiculopathy . . . ? Is there anything in the physical examinations that Dr. Lemke did that's consistent with a finding

of lumbar radiculopathy?" (*Id.*) "I don't believe there is," Dr. Rubin responded, "I don't see it on his notes." (*Id.*)

Asked about Plaintiff's functional capacity, Dr. Rubin pointed to Dr. Ramsey's report, which noted pain but found no objective evidence except a positive straight-leg-raise test on the left (without specifying a nerve root). (ECF No. 9, PageID.146.) Based on "most of the notes," Plaintiff "was mildly affected by intervertebral disc disease and lumbar radiculopathy." (*Id.*) For support, he pointed to observations in Dr. Tsekhanov's report (ECF No. 9, PageID.624) of Plaintiff's difficulty getting on and off the examination table. (ECF No. 9, PageID.147.)

He also noted that Plaintiff was unable to flex past 20 degrees. (ECF No. 9, PageID.146.) The conversation then moved to biking, specifically ram's horn handlebars. (*Id.*) Dr. Rubin estimated that the flexion necessary to ride such a bike was "[p]robably about 40 degrees, at least." (ECF No. 9, PageID.148.)

With disc protrusions, fragments, and herniations, an individual would experience intermittent pain that made it difficult to lift, sit, or stand for long periods. (ECF No. 9, PageID.149-150.) Pain in the lower back, legs, and buttocks, and weakness in the legs were signs of degenerative disc disease. (ECF No. 9, PageID.151.) Also, the medications Plaintiff was on during the relevant period were capable of making an individual drowsy. (ECF No. 9, PageID.152.)

### iii.    Vocational Expert Testimony

Finally, the vocational expert (VE) was called to testify. (ECF No. 9, PageID.155.) To make that testimony meaningful, however, the ALJ first questioned Plaintiff about his

previous jobs. His job as an account manager was essentially a sales position. (ECF No. 9, PageID.159.) Ninety-percent of it was spent on the road and the heaviest lifting he did was 15 pounds, which he needed help with. (ECF No. 9, PageID.160.) In another account-manager position, he sat for four hours a day, stood and walked the rest, and lifted less than ten pounds. (ECF No. 9, PageID.161.) As a program manager, he sat, stood, and walked, each for a third of the day. (ECF No. 9, PageID.162.) He lifted up to 30 pounds. (ECF No. 9, PageID.163.) In a different job, where he was also a program manager, Plaintiff sat for half the day. (*Id.*) He also worked as a liaison, where he lifted only five pounds and sat, stood, and walked for a third of the day each. (ECF No. 9, PageID.164.)

From this, the VE produced three job titles: program manager, sales account manager, and manufacturing representative. (ECF No. 9, PageID.172-173, 175.) The ALJ then asked the VE to

> start . . . with a hypothetical that allows for light work, no ladders, ropes and scaffolds, occasional climbing of ramps, stairs, stooping, balancing, kneeling, crouching, crawling, avoiding more than occasional exposure to hazards such as dangerous moving machinery or unprotected heights . . . .

(ECF No. 9, PageID.176.) According to the VE, an individual with those restrictions could perform Plaintiff's past work in the three positions noted above. (ECF No. 9, PageID.177.) The ALJ then posed another hypothetical:

> start . . . with a light exertional level, and have no ladders, ropes and scaffolds, occasional stooping, climbing of ramps or stairs, or kneeling, crouching, crawling, balancing . . . .
>
> And in addition, the left extremity push and pull would be limited to occasional, and the left upper extremity reaching overhead would be limited to frequent, and the left upper . . . extremity handling would be limited to frequent as well.

(*Id.*) With those restrictions, the jobs would still remain available. (ECF No. 9, PageID.178, 181.)

Next, the ALJ asked about an individual with the following restrictions: "sedentary exertional limitations, no ladders, ropes or scaffolds, occasional ramps, stairs, stooping, balancing, kneeling, crouching, crawling, avoiding more than occasional exposure to dangerous moving machinery or unprotected heights." (*Id.*) The program manager position would remain available, but not the other positions. (ECF No. 9, PageID.182.) The VE also testified that an individual typically could miss up to two days of work per month and take unscheduled breaks for up to ten percent of the work day. (ECF No. 9, PageID.184-185.)

### F.   Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[11] carve the evidence into two categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9,

---

[11]  Various regulations were amended after the claim was filed. See, e.g., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). The governing regulations here, however, expressly apply to claims filed before March 27, 2017, like Plaintiff's. See 20 C.F.R. § 404.1527.

2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, she is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial

28

evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling (SSR) 96-7p, 1996 WL 374186

(July 2, 1996) and SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016).[12] Credibility

determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet*

*v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's

credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of*

*Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d

387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996

WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by

confirming that objective medical evidence of the underlying condition exists. The ALJ

then determines whether that condition could reasonably be expected to produce the

alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20

C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v.*

*Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the

extent of the work-related limitations by determining the intensity, persistence, and limiting

effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of*

*Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*,

749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's

---

[12] After the ALJ's decision in this case, the Commissioner rescinded SSR 96-7p and eliminated the term
"credibility" from Administration policy. SSR 16-3p, 2016 WL 1119029, at *1. The underlying regulation,
however, has remained materially unchanged. *See* 20. C.F.R. § 404.1529(c).

description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 16-3p, 2016 WL 1119029, at *5; SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

(i)   [D]aily activities;
(ii)  The location, duration, frequency, and intensity of . . . pain;
(iii) Precipitating and aggravating factors;
(iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)   Treatment, other than medication, . . . received for relief of . . . pain;
(vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 16-3p, 2016 WL 1119029, at *7; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

### G.   Arguments and Analysis

Plaintiff offers two arguments: (1) "the record does not support a finding that Plaintiff would miss work no more than two days per month"; and (2) the ALJ erred in assigning little weight to Dr. Rubin's opinion that Plaintiff met listing 1.04(A). (ECF No. 9, PageID.737, 751.) I address each argument in turn.

### 1.   Missing More than Two Days of Work Per Month

Plaintiff's first argument is that the ALJ erred in finding that Plaintiff would not

miss work more than two days per month. (ECF No. 9, PageID.737.) Under SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996), the ALJ "must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." Here, Plaintiff offers various rationales for his argument that he cannot sustain work on a "regular and continuing basis." They are best analyzed seriatim.

First, Plaintiff notes Dr. Tsekhanov's opinion that he "may be a candidate for part-time employment in an office setting." (ECF No. 13, PageID.738 (*citing* (ECF No. 9, PageID.626).) To Plaintiff, this supports his assertion that he could not work full-time due to pain and the side-effects from medications. (*Id.*) Dr. Tsekhanov did not explain the reason for his opinion, however. It does not appear to have rested on the medication side-effects, which are nowhere mentioned in his report. (ECF No. 9, PageID.623-626.) The ALJ rejected the opinion because it was "vague," inconsistent with other medical evidence, did not offer a "function-by-function evaluation of claimant's limitation," and seemed to be "based largely on claimant's subjective allegations" rather than objective evidence. (ECF No. 9, PageID.62-63.)

These were valid justifications for the ALJ's weighting of the opinion. Specifically, the ALJ was entitled to discredit an opinion that was grounded primarily on Plaintiff's subjective complaints. *See Cosma v. Comm'r of Soc. Sec.*, 652 F. App'x 310, 311 (6th Cir. 2016). Dr. Tsekhanov seems to have adopted Plaintiff's complaints when assessing his

fitness for full-time work. He noted that "prolonged" sitting, standing, and walking were all "unbearable" for Plaintiff. (ECF No. 9, PageID.626.) Yet, his objective findings reported only a slight limp with no use of an assistive device, full strength, alert presence, and normal reflexes. (ECF No. 9, PageID.625.) While he did find some numbness, spasms, and other deficits, Dr. Tsekhanov seemed unaware of Plaintiff's exercise routine lasting at least an hour if not two, which as described more below suggested he could sustain sitting, standing, and walking. (ECF No. 9, PageID.86-87, 128, 130.) Nor did Dr. Tsekhanov account for Plaintiff's admission, in his 2011 function report—written right in the middle of the disability period—that he could walk a full mile before needing a short rest. (ECF No. 9, PageID.499.) In any event, Plaintiff does not directly contend that the ALJ mis-weighed the opinion. I do not find that Dr. Tsekhanov's opinion carries the day for Plaintiff.

Plaintiff next mentions that Dr. Rubin's "testimony was consistent with Plaintiff's testimony about his ability to do activity for periods of time and then rest was needed due to the aggravation of the pain level." (ECF No. 13, PageID.738.) The argument appears to relate to Dr. Rubin's testimony that Plaintiff's pain would come and go, that sitting or standing for long periods would prove difficult, and that lying down might alleviate the pain. (ECF No. 13, PageID.749.) From that, Plaintiff divines that "Dr. Rubin's testimony demonstrates that plaintiff had the ability to perform activity limited [sic] times and required rest periods to continue." (*Id.*) At best, the testimony was consistent with such a finding. But Dr. Rubin did not directly testify about Plaintiff's ability to sustain full-time work—of course, by suggesting Plaintiff met the listing, he indicated that Plaintiff could not sustain such work, but that does not provide direct support for Plaintiff's assertion that

33

pain or medication side-effects would cause him to miss work more than two days per month. Therefore, I find the argument unconvincing.

Much of the Plaintiff's brief takes aim at the ALJ's reliance on Plaintiff's daily activities, including his exercise regimen. (ECF No. 9, PageID.738-741.) In her decision, the ALJ observed the record's many references to Plaintiff's daily activities and his pronouncements of what he thought he could do. She noted, for example, that he professed to have no limitations in walking a mile, climbing stairs, participating in recreation, and engaging in moderate activities like golf or bowling. (ECF No. 9, PageID.55 (*citing* ECF No. 9, PageID.608).) Further, he had only a "little" limitation in numerous other activities, like running, lifting groceries, and sitting at a desk for eight hours. (*Id.*) Also flagged in the ALJ's decision was the November report mentioning Plaintiff's "aggressive home program, which he has been following through of aggressive cardiovascular condition, such as biking as well as core strengthening and flexibility exercises." (ECF No. 9, PageID.586; *see* ECF No. 9, PageID.55 (ALJ decision).) More directly, the ALJ listed the various activities Plaintiff engaged in, including shopping, driving, walking his dog, biking, fishing, caring for his mother, attending church, watching television, practicing yoga, stretching, and exercising by doing push-ups, leg lifts, and core strengthening. (ECF No. 9, PageID.57.) Also noted were the inconsistencies between Plaintiff's 2013 and 2015 testimony regarding the duration of his exercising, as well as the testimony's inconsistency with his December 2012 statement that he exercised five days per week. (ECF No. 9, PageID.57.) The ALJ acknowledged Plaintiff's assertion that he needed to lie down after sitting or standing too long. (ECF No. 9, PageID.55.) She also recognized that his activity

level could vary each day. (ECF No. 9, PageID.57.) Nonetheless, she concluded that his ability to undertake these activities suggested a much higher degree of functioning than he claimed. (*Id.*)

Plaintiff counters that his "ability to do some exercise, some bike riding or some household chores, does not equate with working an 8 hour shift." (ECF No. 13, PageID.738.) He then recounts his exercise routine and notes that it reduced his pain. (ECF No. 13, PageID.739.) He suggests that intermittent activities—done with great pain that precluded prolonged sitting, standing, or walking—do not rise to the level of full-time work. (ECF No. 9, PageID.740-742.)

I disagree with Plaintiff's argument. For starters, the regulations required the ALJ to consider Plaintiff's daily activities. 20 C.F.R. § 404.1529(c)(3). This consideration would be for naught if, to be meaningful, those daily activities had to be the equivalent of full-time employment. Yet, that is what Plaintiff appears to assume. Nothing, however, precludes ALJs from interpreting claimants' daily activities as signs that they *could* work full time. Consequently, courts have upheld ALJs' reliance on similar—even less intense— activities. *See, e.g.*, *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997) ("Walters admits being able to run all of his errands, walk two miles, prepare all of his meals, and drive three times a week. The ALJ acted properly when he took these factors into account."); *Oudsema v. Comm'r of Soc. Sec.*, 2013 WL 588925, at *6 (W.D. Mich. Feb. 13, 2013) (finding it "appropriate" for the ALJ to consider daily activities such as washing dishes, caring for a pet, watching movies, preparing meals, taking walks, and shopping).

It is true that "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see also Rogers*, 486 F.3d at 248-249. But courts have found that a schedule like Plaintiff's—with chores and exercises like bike riding, yoga, and walking—is a valid reason for an ALJ to discredit a claimant's subjective complaints. *See, e.g.*, *McHenry v. Berryhill*, 911 F.3d 866, 874 (7th Cir. 2018) ("Neither did the ALJ err when he discredited McHenry's descriptions of the severity and intensity of her impairments during the relevant period by invoking her physical activities, including yoga, biking, gardening, and extensive travel."); *Bainbridge v. Colvin*, 618 F. App'x 384, 388 (10th Cir. 2015) (including biking, walking, shopping, housework, and driving); *Graham v. Berryhill*, 2018 WL 4519123, at *12 (D. S.C. Apr. 17, 2018) (involving yoga, walking, and exercise); *Kroon v. Colvin*, 2016 WL 106865, at *10 (D. Colo. Jan. 11, 2016) (including biking, walking a dog, shopping, household chores, and yoga); *cf. Pfister v. Colvin*, 2013 WL 6247232, *9 (E.D. Penn. Dec. 2, 2013) (in a case involving psychiatric impairments, the court found that daily activities including yoga, exercise, riding a bike, and walking were valid reasons to discredit the plaintiff). "[M]ild therapeutic" exercise might not "necessarily undermine the claimant's pain allegations," *Michelle Ann H. v. Comm'r of Soc. Sec.*, 2019 WL 943395, at *6 (E.D. Wash. Feb. 26, 2019), but the exercise here was characterized as "aggressive" and Plaintiff repeatedly stated that it could last up to two hours (although he later qualified that assertion). (ECF No. 9, PageID.86-87, 93, 494-495, 586.)

Moreover, the daily activities here correspond to the same functional capacities that Plaintiff claims are limited by pain, such as standing, sitting, and walking. *Cf. Brooks v.*

36

*Soc. Sec. Admin.*, 430 F. App'x 468, 480 (6th Cir. 2011) (rejecting the ALJ's assertion that the claimant's daily activities "directly refute" asserted limitations). Again, this correspondence does not mean that Plaintiff's daily activities are factually inconsistent with an inability to work—that is, that someone capable of doing his activities *ipso facto* can work. Rather, the activities reveal greater capacities in the very functional categories that Plaintiff claims preclude him from working. They therefore simply increase the probability that he has the ability to work.

Relatedly, as noted, the ALJ recognized that this evidence had the same limitations that Plaintiff now emphasizes; namely, that his activity level could vary. (ECF No. 9, PageID.57.) Thus, Plaintiff's argument comes down to a claim that the ALJ placed too much weight on his daily activities. But the Court cannot consider requests to reweight the evidence. *See Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982).

Finally, courts are less concerned about reliance on daily activities when the ALJ offered other rationales for their credibility assessments. *See Bainbridge*, 618 F. App'x at 688. The ALJ in this case noted, in addition to Plaintiff's daily activities, that his treatments were relatively successful in managing pain, the objective evidence did not support his assertions, and the treatment history indicated that he failed to complain about medication-induced fatigue. (ECF No. 9, PageID.57-58.) These were acceptable factors for the ALJ to consider together with daily activities. *See* 20 C.F.R. §§ 404.1529(c)(2)-(3).

The last leg of Plaintiff's argument is that "the ALJ failed to fully consider the side effects of plaintiff's medications" despite his testimony and written submissions that stated

his medications made him sleepy. (ECF No. 13, PageID.742 (*citing* (ECF No. 9, PageID.132, 501, 515)).) As part of the argument, he also notes Dr. Lemke's functional capacity report, which stated that medications made Plaintiff drowsy, that he would miss work three days per month, and that he would need up to five unscheduled breaks of 15 minutes per day. (ECF No. 13, PageID.740-741 (*citing* (ECF No. 9, PageID.653, 656)).)

Plaintiff does not explain how the ALJ's consideration was less than full, as her decision examines all the evidence and arguments he now presents. She noted, for example, that the records did not reveal that Plaintiff complained of side effects to his medical providers. (ECF No. 9, PageID.58.) I have found no such complaints and Plaintiff cites none. Further, the ALJ wrote that "Dr. Lemke's office notes also indicate that the claimant was awake, alert, not lethargic, and there were no mentions of side effects from the prescribed medications." (ECF No. 9, PageID.59.) Indeed, the record shows Plaintiff was consistently alert and not lethargic. (ECF No. 9, PageID.570, 571, 574, 575, 625, 652, 691, 714.) Further, the ALJ noted that Plaintiff took only "a very conservative amount of medications." (ECF No. 9, PageID.56.); *see* 20 C.F.R. § 404.1529(c)(3)(iii) (requiring ALJs to consider medication dosages).[13]

Thus, the ALJ was justified in rejecting Dr. Lemke's opinion that Plaintiff would be absent from work three days a month and need multiple unscheduled breaks each day.

---

[13] The ALJ stated that Plaintiff too "Norco once or twice a month, Mobic on a daily basis, Xanax once every two weeks, and Tramadol once every two weeks." (ECF No. 9, PageID.56.) But as Defendant notes, this overstates the frequency with which he took Norco; he testified that he used that medication only once every month or two. (ECF No. 9, PageID.119-120; ECF No. `17, 768.) This mistake, of course, favors Plaintiff and therefore caused him no prejudice.

(ECF No. 9, PageID.60.) As she explained, Dr. Lemke provided no explanation for this opinion "other than 'good days' and 'bad days.'" (*Id.*) In fact, as the ALJ observed, the same month Dr. Lemke rendered this opinion, in December 2012, Plaintiff told Dr. Luders that he exercised five times each week. (ECF No. 9, PageID.60, 652.) For the reasons discussed above, the ALJ could rely on the exercise regimen. In any event, as Defendant points out (ECF No. 17, PageID.773), an estimate of a claimant's absenteeism is not a medical opinion entitled to weight. *Paul v. Comm'r of Soc. Sec.*, 2018 WL 4500200, at *5 (E.D. Mich. Aug. 24, 2018), *rep. & rec. adopted by* 2018 WL 4492272 (E.D. Mich. Sept. 19, 2018).

Accordingly, I conclude that Plaintiff's argument regarding absenteeism is unpersuasive.

### 2.    Listing 1.04(A) and Dr. Rubin's Testimony

Plaintiff's second argument focuses on the ALJ's decision at step three to give little weight to Dr. Rubin's testimony that Plaintiff met listing 1.04(A). (ECF No. 9, PageID.53; ECF No. 13, PageID.743-751.) Claimants with impairments meeting or equaling a listing are deemed disabled at step three without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Each listing contains specific criteria that the claimant must satisfy. 20 C.F.R. § 404.1525(c) (2016). When the criteria are not met, a claimant might still be rendered disabled by impairments equal to the listings. This equivalence comes in three scenarios:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do

not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 Fed.Appx. 411, 414 n. 2 (6th Cir.2011) (quoting 20 C.F.R. § 404.1526 (2011)).

The relevant listing here is 1.04, which addresses "[d]isorders of the spine," such as degenerative disc disease, that "result[] in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 1.04 (Aug. 2015). In addition, listing 1.04(A) requires:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 1.04(A) (Aug. 2015).[14] "Inability to ambulate effective means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 1.00(B)(2)(b)(1) (Aug. 2015). Generally, this means that an individual cannot independently ambulate "without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 1.00(B)(2)(b)(1) (Aug. 2015).

The Sixth Circuit discussed the "strict requirements" of 1.04(A) in *Lawson v. Comm'r of Sec. Sec.*, 192 F. App'x 521, 529, 530 (6th Cir. 2006). It "requires a finding of

---

[14] This is the relevant listing at the time of the ALJ's decision.

limitation of motion of the spine and loss of motor reflex." *Id.* at 529. Because the plaintiff's reflexes and range of motion were normal in *Lawson*, she did not meet that listing. *Id.* at 529-530.

Most of Dr. Rubin's testimony focused on whether the evidence showed nerve root compression. Caselaw from the relevant period discussing listing 1.04(A) generally required concrete proof of actual compression, rather than mere suggestions that a nerve root is affected, to trigger further inquiry or otherwise support the claimant. *See, e.g.*, *Adams v. Comm'r of Soc. Sec.*, 2014 WL 897381, at *9 n.5 (E.D. Mich. Mar. 6, 2014) (noting that recent MRI results would not have altered the ALJ's decision on nerve root compression because they "indicate only that a disc protrusion 'abuts the S1 nerve roots,' not that there is evidence of nerve root compression"); *Barnes v. Comm'r of Soc. Sec.*, 2013 WL 6328835, at *9 (E.D. Mich. Dec. 5, 2013) ("[Claimant's] x-ray and CT scan show degenerative disc disease and spinal canal stenosis, but there is no mention of nerve root compression in the radiologist's reports."); *but see Thomas v. Comm'r of Soc. Sec.*, 2014 WL 688197, *6–8 (E.D. Mich. Feb. 21, 2014) (finding that nerve root impingement was equal to nerve root compression).

This approach makes sense. ALJs are laypersons who need expert guidance for interpretations of raw medical data that can lead to diagnoses or assessments of functional capacity. *Cf. Charbonneau v. Comm'r of Soc. Sec.*, 2019 WL 960192, at *15 (E.D. Mich. Jan. 11, 2019), *rep. & rec. adopted by* 2019 WL 952736 (E.D. Mich. Feb. 27, 2019). In a case like the present, where the medical reports and studies do not expressly disclose nerve root compression, an expert was needed to explain whether and how this evidence

41

nonetheless reveals compression.

For the reasons that follow, the ALJ was right to conclude that Dr. Rubin failed to provide the necessary testimony linking the evidence to nerve root compression or other elements of listing 1.04(A). It is true that Dr. Rubin led off his testimony by concluding that Plaintiff met listing 1.04(A). (ECF No. 9, PageID.143-144.) But as the ALJ recounted in her decision, Dr. Rubin's conclusion unraveled when he was pressed to justify it. (ECF No. 9, PageID.53.) The initial evidentiary support offered by Dr. Rubin (ECF No. 9, PageID.143-144) was a single report from Dr. Lemke that nowhere expressly stated that Plaintiff had nerve root compression. (ECF No. 9, PageID.653-656.) Indeed, the cited report was Dr. Lemke's functional capacity assessment, which briefly offered diagnoses (in full, "multilevel spondylosis C spine, HND L4-5") but then discussed Plaintiff's functional abilities rather than underlying medical conditions. (*Id.*) The report therefore did not provide a basis for finding nerve root compression.

Next, Dr. Rubin cited the 2001 laminectomy and a 2010 lumbar spine MRI. (ECF No. 9, PageID.144.) Although he did not explain how the mere fact of having a laminectomy shows compression, an inference could arise that it does; after all, the procedure is known as "decompression surgery." Mayo Clinic, *Laminectomy*, https://www. mayoclinic.org/tests-procedures/laminectomy/about/pac-20394533 (last accessed Nov. 7, 2019). Still, as the ALJ pointed out in her decision, the laminectomy occurred long before the alleged disability and Plaintiff worked afterwards. (ECF No. 9, PageID.53, 58.)

Apparently thinking that the MRI came from around the time of the surgery, the ALJ characterized it as another "very distant" piece of evidence. (ECF No. 9, PageID.53.)

That's not quite the case: the MRI was from 2010. (ECF No. 9, PageID.580-581.) But as with the other evidence, the usefulness of the MRI, even as explained by Dr. Rubin, is limited. Plaintiff notes that the MRI shows "extradural abnormalities," "[a]bnormal signal intensity," and disc protrusion with fragmentation into a lateral recess. (ECF No. 9, PageID.744-745.) It certainly sounds bad. What it all has to do with nerve compression, however, is something neither Plaintiff nor Dr. Rubin explained. The latter testified simply that nothing explicitly discussed "nerve root weakness beyond what the MRI describes." (ECF No. 9, PageID.144.) He seems to have discerned something relating to compression in the raw MRI data, yet he failed to translate any such insight—which could only have been based on expert medical knowledge—into a meaningful explanation for the ALJ. At best, then, the ALJ was left with a hunch that Dr. Rubin might have gleaned something from the MRI. The ALJ was not required to credit this speculation.

Pressing on, the ALJ properly relied on Dr. Rubin's inability to produce evidence from examinations that demonstrated compression. (ECF No. 9, PageID.53.) The ALJ squarely asked him if "Dr. Lemke ever performed a lumbar back examination that would be consistent with the diagnosis of lumbar radiculopathy." (ECF No. 9, PageID.145.) Dr. Rubin could not find any such examination. (*Id.*) He merely asserted that Dr. Lemke's functional capacity report "suggested" lumbar radiculopathy, (*id.*), which "is typically caused by a compression of the spinal nerve root." Emory Healthcare, *Lumbar Radiculopathy (Nerve Root Compression)*, https://www.emoryhealthcare.org/orthopedics/lumbar-radiculopathy.html (last accessed Nov. 7, 2019).

This assertion was conjectural. To credit it, one would have to believe that Dr. Rubin

43

could reasonably interpret the functional limitations in the report as a sign of radiculopathy. This would require that he reasonably read, say, a limitation to occasional lifting of ten pounds as objective evidence of radiculopathy. Even if such a thing were possible, he would have needed to rule out other possible conditions that would cause this functional limitation, and there's no indication he did so. *Cf. CW ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 832 n.4 (7th Cir. 2015) ("A differential etiology is a process-of-elimination approach to determining a subject's cause of injury. Under this method, an expert "considers all relevant potential causes of the symptoms and then eliminates alternative causes." (*quoting* Federal Judicial Center, *Reference Manual on Scientific Evidence*, 214 (1994))). The ALJ did not need to adopt these conjectures.

To be fair, Dr. Rubin also noted that the post-MRI notes from Dr. Lemke contained a reference to "lumbar radiculopathy," (ECF No. 9, PageID.144, 575), but it is not clear what prompted this note. No such diagnosis appeared in Dr. Lemke's functional capacity report, which Dr. Rubin heavily relied upon. (ECF No. 9, PageID.653-656.) And Dr. Rubin later confirmed that no examination results supported this assessment. The ALJ again asked, "Is there anything in the physical examinations that Dr. Lemke did that's consistent with a finding of lumbar radiculopathy?" (ECF No. 9, PageID.145.) Dr. Rubin responded, "I don't believe there is, Your Honor. I don't see it on his notes." (*Id.*) Shortly after this exchange, Dr. Rubin cited a few examination results, but nothing that would sufficiently establish nerve root compression; indeed, some of it seems to suggest no compression. (ECF No. 9, PageID.146.) He noted Dr. Ramsey's examination at which Plaintiff exhibited full leg strength and reflexes, with some left-hand numbness and a positive straight-leg-

raise test on the left side. (*Id.* (discussing (ECF No. 9, PageID.632-642).) Other than the straight-leg-raise test, "there was no objective evidence" of compression, and even that test would not "give you a specific nerve root," Dr. Rubin stated. (ECF No. 9, PageID.146.) Dr. Ramsey also thought that the objective evidence did not bear out the claimed severity of Plaintiff's impairments. (ECF No. 9, PageID.634.)

Analyzing this part of the hearing, the ALJ's decision correctly noted that "one positive straight leg test, 5/5 muscle strength does not equal 'motor loss' as required by listing 1.04(A)." (ECF No. 9, PageID.53.) She went on to say that Plaintiff "exhibited full motor strength continuously throughout the record." (*Id.*) Plaintiff pounces on this as a mischaracterization of the evidence. (ECF No. 13, PageID.747-748.) On a few occasions, Plaintiff indeed displayed varying degrees of diminished strength. (ECF No. 9, PageID.665, 698, 702-703, 781-782 ); of these, however, many tests showed strength at "4," (ECF No. 9, PageID.698, 781-782), which means the muscles activated against some resistance and had full range of motion, Naqvi & Sherman, *supra*. A "4" is considered, at least in some areas, a good to normal grade. Staci Schwartz, et al., *Relationship Between Two Measures of Upper Extremity Strength: Manual Muscle Test Comapred to Hand-Held Myometry*, 73 Physical Med. & Rehabilitation 1063, 1063, 1068 (1992). On other testing, his strength was full. (ECF No. 9, PageID.625, 688.) Thus, the ALJ's comment may have lacked nuance, but it was accurate enough. And, in any case, Plaintiff doesn't attempt to demonstrate that this testing satisfies the muscle weakness requirement in listing 1.04(A).

Plaintiff also cites a few straight-leg-raise tests that were positive. (ECF No. 9, PageID.747 (*citing* (ECF No. 9, PageID.575, 586, 613, 624).) But as Defendant counters,

listing 1.04(A) requires positive results in both sitting and supine straight-leg-raise tests, and here there is no evidence that both types of tests were administered. (ECF No. 17, PageID.781-782, 784.) Additionally, the ALJ acknowledged that the record contained positive test results, but noted negative ones as well. (ECF No. 9, PageID.55-56; *see also* ECF No. 9, PageID.568, 665.) Plaintiff hasn't suggested why the positive results—even if they could satisfy the listing—are more probative than the negative ones.

Like Plaintiff in this Court, Dr. Rubin did not explain the relative merits of the different straight-leg-raise tests administered to Plaintiff, as he noted only one positive straight-leg-raise test result. (ECF No. 9, PageID.146.) This oversight, or perhaps condensation of the record, lends credence to the ALJ's suggestion that Dr. Rubin was unfamiliar with the record. (ECF No. 9, PageID.53.) Also supporting that suggestion was Dr. Rubin's statement that "according to most of the notes I have, [Plaintiff] was unable to flex past 20 degrees." (ECF No. 9, PageID.146.) That statement disregards multiple reports to the contrary. *See* (ECF No. 9, PageID.624-625 (dorsolumbar flexion of 60 degrees, with right and left lateral flexion at 20 degrees; cervical flexion at 40 degrees), 665-666 (noting flexion of greater than 20 degrees in all areas of spine except right and left lateral flexion of dorsolumbar spine), 698 (noting 40 degrees flexion).) It also glosses over Plaintiff's biking with ram's horn handlebars, which as Dr. Rubin noted at the hearing likely would require 40 degrees flexion. (ECF No. 9, PageID.146, 148.) The ALJ rightly relied on this testimony to question Dr. Rubin's familiarity with the record and discredit his opinion. (ECF No. 9, PageID.53.)

The ALJ also questioned Dr. Rubin's knowledge of listing 1.04(A), (ECF No. 9,

46

PageID.53), which Plaintiff takes issue with, (ECF No. 13, PageID.748). It appears the ALJ's comment was prompted, at least in part, by Dr. Rubin's response noting Plaintiff had full strength in his extremities—hardly evidence to meet the listing's muscle-weakness requirement. (ECF No. 9, PageID.146.) Also, as explained above, Dr. Rubin left a great deal to be inferred from his testimony, never clearly linking his statements to nerve root compression or describing the listing's other elements. Regardless, the ALJ did not over-rely on this observation. Rather, it was a tack-on at the end of her analysis.

In a like manner, Plaintiff complains about the ALJ's statement that "Dr. Rubin's testimony does not support the claimant . . . would be limited from all work activity due to his physical limitations." (ECF No. 9, PageID.53; ECF No. 9, PageID.748-749.) Plaintiff counters: "Dr. Rubin did not testify that plaintiff was limited from all work activity, however . . . ." (ECF No. 13, PageID.748.) Yet, the ALJ never said he did. Instead, in summing up the analysis, the ALJ simply concluded that Dr. Rubin's testimony—whatever that testimony might have been—did not support a finding that was precluded from all work activity. Thus, Plaintiff's argument is mistaken.

From there, Plaintiff recites various medical evidence such as his 2010 MRI showing extradural abnormalities and disc protrusion, his complaints of low back pain, limitations in his spinal range of motion, and decreased strength. (ECF No. 13, PageID.749-750.) The problem with this approach is twofold. First, it disregards contrary evidence, like that discussed above, showing full strength and reflexes, for example. (ECF No. 9, PageID.625.) When evidence conflicts in this manner, it is imperative to know why one side's evidence is so much more probative than the other's that the ALJ's decision

47

lacks substantial evidence—a conclusion that cannot be reached by the court's own reweighing of evidence on appeal. *See Mullins*, 680 F.2d at 472. Second, and related, is Plaintiff's failure to connect the evidence to the listing's elements. Do extradural abnormalities signify nerve root compression? Do disc protrusions? Or is either related to neuro-anatomic distribution of pain? Plaintiff does not address these questions and therefore his argument fails to persuade.

For these reasons, I conclude that Plaintiff's argument does not merit relief.[15]

## CONCLUSION

For the reasons above, I recommend **DENYING** Plaintiff's Motion for Summary Judgment, (ECF No. 13), **GRANTING** the Commissioner's Motion, (ECF No. 17), **AFFIRMING** the Commissioner's final decision.

## IV.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985);

---

[15] Plaintiff has not made the case that his impairment's severity equaled that of listing 1.04(A). His argument instead sticks to the ALJ's analysis of Dr. Rubin's opinion that he met the listing. (ECF No. 13, PageID.751 ("It is submitted that Dr. Rubin's opinion regarding meeting listing 1.04 is supported by the record. It is submitted that Dr. Rubin's testimony and opinion was [*sic*] entitled to great weight.").) Therefore, medical equivalence is not considered above.

*Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  November 14, 2019

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: November 14, 2019

By s/Kristen Castaneda
Case Manager